# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Algie R. Neal,

Plaintiff,

Civ. No. 04-2985 (RHK/JSM)
**MEMORANDUM OPINION
AND ORDER**

v.

Eniva Corporation,

Defendant.

Algie R. Neal, pro se, Chanhassen, MN.

David P. Jendrzejek and J. Vincent Stevens, Moss & Barnett, A Professional Association, Minneapolis, MN, for Defendant Eniva Corporation.

## Introduction

Pro Se Plaintiff Algie Neal was employed by Defendant Eniva Corporation ("Eniva") in its Shipping Department from June 2002 until he was fired in May 2003. Neal alleges that he was fired because of his race. Eniva has moved for summary judgment on Neal's claim. For the reasons set forth below, the Court will grant Eniva's Motion.

## Background

Eniva is a Minnesota Corporation that manufactures and distributes health and wellness, body care, automotive and household cleaning products. Neal, an African-American, began working at Eniva as a temporary worker in early 2002. On June 10, 2002,

he was hired as a full-time employee.  At that time, Mark Veloske, a Caucasian, became

Neal's supervisor.  Neal and the other warehouse[1] workers at Eniva were also supervised by

John Robinson, an African-American, and Christine Werner, a Caucasian, both warehouse

leads.[2]  Veloske, who at the time was the Warehouse and Distribution Manager at Eniva,

ultimately supervised the warehouse leads as well.  Dan Conley, the Director of Operations

of Eniva, worked with Veloske on making various employment related decisions.

Generally, warehouse workers helped to fill customers' orders of Eniva products by

picking, packing, and shipping them to customers.

At some point after Neal was hired as a full-time employee, warehouse lead

Robinson was temporarily transferred to the night shift in order to accommodate his

scheduling needs.[3]  Due to this change, Veloske promoted Neal to acting warehouse lead

for a period of time.  In late October or early November, Neal also received a raise,

approved by Veloske and Conley.  (Neal Aff. Ex. J.)  In conjunction with that raise, Veloske

noted on an "Authorization for Salary Adjustment" form that Neal had been performing his

job well, and thus the salary increase was appropriate.  (Id.)  Veloske also noted that he had

"some concern on [Neal's] extra curricular activities with other peers and the way he

---

[1]The Shipping Department is also referred to in the record as the "warehouse."

[2]The position of "warehouse lead" does not appear to be defined by either party in the record.

[3]There is a factual dispute regarding when Neal was promoted to acting warehouse lead.  (Compare Veloske Decl. ¶ 4, with Amended Compl. Supp. ¶ (II)(e).)  The exact timing of the promotion is not relevant for purposes of this Motion.

handles himself in other circumstances around the opposite sex.  We have discussed these concerns and is aware of the areas he needs to improve . . . ."  (Id.)

### A.     Allegations of Harassment

In late September 2002, Veloske received a report that Neal had propositioned Jovan Bebeau, a co-worker.  (Veloske Decl. ¶ 7.)  According to Bebeau, Neal "made many inappropriate and harassing comments and gestures of a sexual nature to [her]" and he "frequently made lewd sexual remarks to [her] that made [her] feel very uncomfortable." (Bebeau Decl. ¶ 2.)  She stated that Neal "wanted to know what [her] favorite sexual positions were and wanted to talk about oral sex."  (Id. at 2.)

Veloske spoke to Neal about the harassing behavior, and told him that his conduct violated company policy and was unacceptable.  (Veloske Decl. ¶ 7.)  He also noted the problems posed by the harassing behavior in a "Disciplinary Action Form" dated October 3, 2002.  (Id. Ex. B.)  Under "Reason for Action," Veloske wrote "[t]here are several reasons for concern which are to be investigated.  They are to include: Harassment behaviors . . . ."[4] (Id.)

Around this time, Neal and co-worker Orville Foster, an African-American, submitted a written complaint to Veloske regarding Peggy Carter, a Caucasian co-worker.

---

[4]Neal never received the Disciplinary Action Form, but does not expressly deny receiving a verbal warning from Veloske regarding the write-up.  (Amended Compl. Supp. ¶ (II)(d).)  A note on the Disciplinary Action Form states that "[a] verbal warning was given to [Neal], notifying him that the next infraction would lead to termination."  (Veloske Decl. Ex. B.)  Veloske signed his name by that note, and dated it November 3, 2002.  (Id.)

(See Neal Aff. Ex. R.)  The written complaint, dated October 4, 2002, alleged that Carter

overheard a conversation between Neal and another female co-worker (presumably

Bebeau), and after overhearing the conversation, Carter approached Bebeau "and insisted

that she file a sexual harassment case against [Neal]."  (Id.)  The complaint also alleged that

Carter was insensitive to her African-American co-workers, that she did not condone inter-

racial relationships, and that she often complained about African-American music being

played on the shipping radio.  Peggy Carter was given a verbal warning in response to the

written complaint.  (Neal Aff. ¶ 10; Carter Dep. Tr. at 16.)

### B.     Time Card Infractions

Around the time of the Bebeau incident, Veloske also received a report from

Werner, one of the warehouse leads, that Neal and another co-worker had violated Eniva's

time-clock policy.  (Veloske Decl. ¶ 8.)  The time-clock policy provides that

> employees should accurately record the time they begin and end their work,
> as well as the beginning and ending time of each meal period. . . .  Altering,
> falsifying, tampering with time records, or recording time on another
> employee's time record may result in disciplinary action, up to and including
> termination of employment.

(Id. Ex. A.)  On October 1, 2002, Werner observed Neal "punch-out" a time-card[5] for one

of his co-workers who had left work early.  (Werner Decl. ¶ 5.)  After Werner reported this

to Veloske, Veloske spoke to Neal and his co-worker about the time-clock violation and

---

[5]While not explained in detail in the record, it appears that Eniva's warehouse
workers used a punch-clock and time-cards to log their hours.  Thus, they "punched-in" at
the beginning of the day, "punched-out" at the end of the day, and did the same to indicate
when they were on lunch or a break.

told Neal that his actions violated company policies.  (Veloske Decl. ¶ 8.)  Based on the

report from Werner, on the October 3, 2002 Disciplinary Action Form, Veloske included

"Fraud of Timecard and Work Performance" under "Reason for Action."  (Id. Ex. B.)

Veloske was aware of two other time-clock policy infractions by Neal.  On May 8,

2003, Veloske observed Neal and Robinson outside working on Robinson's motorcycle.

(Id. ¶ 9.)  Veloske checked their time-cards and saw that they had not punched-out.  Veloske

marked them out.  (Id.)  Scott Ehalt, a Caucasian, was also outside working on Robinson's

motorcycle with Neal and Robinson at the time.  (Robinson Dep. Tr. at 62-64; Enge Dep.

Tr. at 34.)  While Veloske denies seeing Ehalt outside with Neal and Robinson (Veloske

Dep. Tr. at 61), Robinson testified that Ehalt was standing outside when Veloske came out

and witnessed them working on the motorcycle (Robinson Dep. Tr. at 64).  Veloske did not

mark Ehalt's time-card out.

On May 22, 2003, Veloske received a report from one of Neal's co-workers that

Neal, Rith Jal, an African immigrant, and Dana Enge, a Caucasian, had punched-out, left the

building, and then punched back in before sitting down to have lunch.  (Veloske Decl. ¶ 10.)

Veloske checked the time-cards and determined that Neal was in violation of the

policy—his time-card was consistent with the co-worker's report that Neal punched-in

before he sat down to eat lunch.  (Id.)  Enge's time-card revealed that he too was "in

violation" of the time-clock policy, though in a different way than Neal was.  (Veloske Dep.

Tr. 92-93, 96-98; Neal Aff. Ex. I.)  It appears that Enge did not punch-in until after he ate

lunch, and thus was on his lunch break for 35 minutes—5 minutes longer than the half-hour

generally allowed for lunch. (Veloske Dep. Tr. 92-93, 96-98.) Veloske did not, however,

immediately consider Enge in violation; at the time he checked the time-cards, he noted

that "[Neal] was the only person in violation of the timecard rules!" (Neal Aff. Ex. I.)

According to Veloske, his decisions regarding which time-card violations merited attention

were based on "management discretion."[6] (Veloske Dep. Tr. at 97.) He also testified that

he would verify his decisions regarding time-clock violations "by prior performances, prior

problems, each individual is different there." (Id. at 98.)


### C.    Altercations with Tina Duffy[7]

Tina Duffy was a co-worker of Neal's. She began working at Eniva in April 2002,

and is still employed there. According to Duffy, "Neal shouted at [her] and verbally

attacked [her] twice" during his time at Eniva. (Duffy Decl. ¶ 4.) The first incident

occurred on September 3, 2002, when Duffy and other employees were waiting for a

Shipping Department meeting to begin. Neal shouted at Duffy in front of the other

employees waiting for the meeting that Duffy "was 'the laziest fucking person back here.'"

(Id. ¶ 4.) Duffy submitted a written complaint regarding the confrontation to Veloske. (Id.,

---

[6]In this situation, Veloske stated that he would consider whether Enge got in five minutes early or stayed five minutes late. (Id. at 96-98.)

[7]Tina Duffy was married in 2004, and her last name is now Capman. For simplicity, the Court will refer to Tina Capman by her former surname, Duffy.

Ex. A.)  Neal denies the incident happened, and claims that Veloske never spoke to him regarding Duffy's allegations.[8]  (Amended Compl. Supp. ¶ (II)(b).)

On May 22, 2003, Neal and Duffy were again involved in an incident.  According to Duffy, Neal asked her a question regarding the work being done that day, to which she responded that "it wasn't his business."  Neal then asked "What?"  Duffy "repeated [herself] a little more loudly because [she] thought" Neal had not heard her the first time.  Neal then began yelling at Duffy "for at least several minutes" stating "What do you mean it's none of my damn business!  I'm Big Al.  You can't talk to me like that.  I'm not Vitaly or Yelena.[9] I'm Big Al."  Neal continued in this manner, repeating himself, and then said to Duffy, "Big Al will hit somebody."  (Duffy Decl. ¶ 6 (footnote added).)

Duffy states that she began to cry, but tried not to let Neal see her crying, and did not say another word during the altercation.  (Id. ¶ 7.)  She felt intimidated and scared by Neal's behavior.  Soon thereafter, Duffy reported the incident to Werner.  (Id., Ex. B.) Werner brought Duffy to see Conley to report the incident to him; he observed that Duffy "looked visibly shaken, upset and frightened.  Her eyes were red and she appeared to have been crying."  (Conley Decl. ¶ 3.)  Duffy recounted the incident, and Conley "believed that she was telling the truth."  (Id. ¶ 4.)

---

[8]Veloske claims that he spoke to Neal about the incident and "warned him that disrespectful behavior toward co-workers violated company policy and would not be tolerated."  (Veloske Decl. ¶ 5.)

[9]Vitaly and Yelena were two other workers at Eniva who Neal believed Duffy did not treat with respect.  (Neal Dep. Tr. at 123-24.)

Duffy also reported the incident to Veloske that afternoon, and prepared a written statement recounting what took place.  According to Veloske, when he discussed the incident with Duffy, she "came to [him] visibly shaken."  (Veloske Decl. ¶ 11.)  Upon hearing about the incident, Veloske "believed that [Duffy] was sincere and telling the truth." (Id. ¶ 12.)  That same afternoon, Veloske interviewed Travis Dwyre, a co-worker who had witnessed the incident, and had Dwyre prepare a written statement at that time.  (Id. ¶ 14.) Dwyre largely corroborated Duffy's account of the incident.  His statement provides in part that Neal said to Duffy "I'm Big Al, not [Vitaly] so don't fucking talk like that and [Neal] went on and on about that for about 10 min. or so just ragging on her about that."  (Id., Ex. C.)  Veloske also talked to two other co-workers, who reported the incident similarly, though they reported that "Duffy's tone of voice could have been more polite."  (Id. ¶ 15.)

According to Neal's version of the May 22, 2003 event, he did not raise his voice to Duffy and the "only person who was yelling was Tina Duffy."  (Neal Dep. Tr. at 125.)  He also asserts that the incident "was a short conversation. . . .  Maybe anywhere from 30 seconds to a minute, I think.  It wasn't very long."  (Id. at 126.)  He also denies ever threatening to hit someone, or being physically intimidating in any way.  He does not, however, deny other aspects of the reported incident, such as his saying "I'm Big Al" and "I'm not Vitaly or Yelena."  (Id. at 123-24.)

### D.    Neal's Termination and Litigation

On May 23, 2003, the morning after the incident with Duffy, Neal's employment at Eniva was terminated.  Veloske and Conley discussed Neal's employment on the afternoon

of May 22, and on May 23.  They "decided that Neal had been given enough chances, and unless Neal had some compelling explanation for his behavior, his employment would be terminated for acting in an inappropriate and intimidating manner toward a co-worker."  (Conley Decl. ¶ 6; see Veloske Decl. ¶ 16.)  Veloske held a meeting with Neal on the morning of May 23, 2003, at the beginning of which Neal stated "If you're going to terminate me, do it now."  (Veloske Decl. ¶ 17.)  Veloske then informed Neal that his employment was terminated.  (Id.)

On June 17, 2004, Neal filed his Complaint alleging that Eniva violated Title VII by firing him because of his race.  Eniva now moves for summary judgment on Neal's claim.[10]

### Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

---

[10]Eniva has also moved to strike Neal's June 21, 2005 Reply and Declaration as impermissible filings under Local Rule 7.1(b).  While the Court agrees with Eniva that Neal's June 21, 2005 submissions to the Court were in violation of the briefing schedule set out in Local Rule 7.1(b), the Court's consideration of Neal's submissions does not change the outcome of the instant Motion.  Accordingly, it will deny Eniva's Motion to Strike.

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## Analysis

Neal alleges that he was fired because of his race in violation of Title VII.[11]  Under

Title VII, it is unlawful for an employer to discharge an individual "because of such

_____

[11]Neal's Complaint lists two claims—one alleging a violation of Title VII, and one
for "wrongful termination."  While he states in his summary judgment papers that he has
alleged claims of discrimination and wrongful termination, his arguments treat these two
claims as one, the basis of which is that he was unlawfully terminated due to his race.  The
Court determines that Neal's Complaint raises a single claim of unlawful termination under
Title VII.
    In addition to allegations generally related to his arguments of wrongful termination,
however, Neal's Complaint states that Eniva failed to "protect [Neal] and other minority
employees from racial discrimination, verbal abuse, and physical threats."  (Amended
Compl. ¶ 1A.)  To the extent that this raises a claim under Title VII, Neal has failed to
present any evidence beyond naked allegations to support his claim.  In fact, the undisputed
evidence shows that the only written complaint Neal submitted to Eniva regarding a co-
worker's racially discriminatory attitude resulted in that co-worker receiving a warning
from Veloske.  Furthermore, while his written complaint stated that his co-worker was
insensitive to African-Americans, it did not include allegations of verbal abuse or physical
threats.
    Neal's Complaint also states that Eniva submitted a "false and inaccurate summary
of response to a federal agency: the E.E.O.C."  (Id.)  The Court is not aware of any evidence
to support this allegation.

individual's race." 42 U.S.C. § 2000e-2(a)(1). Where there is no direct evidence of

discrimination, the McDonnell Douglas burden-shifting framework is applied. Turner v.

Honeywell Fed. Mfg. & Techs., LLC, 336 F.3d 716, 720 (8th Cir. 2003) (citing McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 801-04 (1973)). Under this framework, a

presumption of discrimination is created when the plaintiff meets his burden of

establishing a prima facie case of employment discrimination. Rothmeier v. Inv. Advisers,

Inc., 85 F.3d 1328, 1332 (8th Cir. 1996) (citation omitted). A minimal evidentiary

showing will satisfy this burden of production. Turner, 336 F.3d at 720 (citation omitted).

Upon establishing a prima facie case of discrimination, the burden of production shifts to

the defendant to show that it had a legitimate, nondiscriminatory reason for its actions.

"Once this burden has been met, the presumption of discrimination disappears, requiring

the plaintiff to prove that the proffered justification is merely a pretext for discrimination.

At all times, the burden of persuasion remains with the plaintiff." Pope v. ESA Services,

Inc., 406 F.3d 1001, 1007 (8th Cir. 2005) (citations omitted). As Neal's case rests on

circumstantial evidence,[12] the Court will analyze his claims under this framework.

---

[12]The only arguable direct evidence is an affidavit of Leanda Muhonen regarding a
comment Veloske is alleged to have made in August 2002. On one occasion, Muhonen
(who does not appear to have ever worked at Eniva) was at a bar with Neal and various other
Eniva employees who had just finished playing softball. She alleges that, at the bar, she
overheard Veloske say to the person next to him: "look at that nigger with that pretty white
girl." (Muhonen Aff. ¶ 4.) According to Muhonen, Veloske was referring to Foster and his
companion. Veloske denies making that statement. (Veloske Dep. Tr. at 188 ("I did not say
that.").) Muhonen alleges that she reported what she heard to Neal, who said he was not
surprised "because [Veloske] shows preferential treatment to the Caucasian employees
different than the African American employees at [his] job." (Muhonen Aff. ¶ 4.) The

A.      **Neal's Prima Facie Case**

Eniva claims that Neal has failed to establish a prima facie case of discriminatory discharge because he was not performing his job adequately at the time of his termination. (Mem. in Supp. at 12-13.)  In order to establish a prima facie case of discrimination on the part of Eniva in terminating his employment, Neal must show that: (1) he is a member of a protected group; (2) he was qualified for his position; (3) he was discharged; (4) the discharge occurred under circumstances giving rise to an inference of discrimination. Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 944-45 (8th Cir. 1994).  The burden of establishing a prima facie case is not onerous.  Id. at 944.

The Court determines that Neal has established a prima facie case of discrimination. Neal received favorable performance reviews from Veloske, and was promoted for a period of time to acting warehouse lead because of good job performance.  He also received a raise during his employment at Eniva.  While the allegations that Neal engaged in harassing behavior may go towards Eniva's reason for his termination, it does not show he was unqualified for his position.

B.      **Eniva's Legitimate, Nondiscriminatory Reasons**

---

Court determines that this disputed conversation is not direct evidence of discrimination, as it was not close in time to Neal's termination and was not made in the context of his employment.  See, e.g., Simmons v. Océ-USA, Inc., 174 F.3d 913, 916 (8th Cir. 1999) (stating that "[b]ecause the [racially offensive] statements and the adverse employment decision were not close in time, [the plaintiff] must establish a causal link between the comments and his termination").

Eniva has advanced three reasons in support of its decision to terminate Neal's employment. According to Eniva, the decision to terminate Neal rested mainly on Veloske and Conley's beliefs regarding Neal's altercation with Duffy. The report from Duffy and others regarding that incident, however, was the culmination of other issues with Neal's employment, such as the time card infractions, and the allegations of Neal's harassing behavior. (Veloske Decl. ¶ 16; Conley Decl. ¶ 6.) Having been confronted with evidence of the altercation with Duffy, Veloske and Conley "decided that Neal had been given enough chances." (Id.) This satisfies Eniva's burden to come forward with a nondiscriminatory reason for Neal's discharge.

### C.     Neal's Evidence of Pretext

Neal challenges Eniva's justification for his termination in numerous ways. He argues that the allegations of his harassing behavior towards Bebeau were racially motivated; that Veloske's enforcement of the time-clock rules was racially biased; and that the May 22, 2003 altercation with Duffy did not occur as she said it did, and that he was not at fault. In determining whether Neal's claim will survive summary judgment, the Court requires "probative evidence of intentional discrimination, not mere allegations based upon facts that as a matter of law are insufficient to establish discrimination." Zhuang v. Datacard Corp., ___F.3d___, 2005 WL 1618774, at *5 (8th Cir. July 12, 2005). The Court will address each of Neal's arguments in turn.

### 1.     Allegations of Harassment

Neal "denies . . . he ever propositioned Jovan Bebeau in any manner, especially in a sexual manner." (Mem. in Opp'n at 3.) Accordingly, he argues that Eniva's reliance on the harassment allegations constitutes a pretext for race discrimination. It is well established, however, that the "key question in a discrimination case like this one is not whether" the misconduct actually occurred, "but whether the employer really <u>believed</u>" that it did. <u>Hitt v. Harsco Corp.</u>, 356 F.3d 920, 924 (8th Cir. 2004) (emphasis in original). Neal has not presented any evidence "showing [Veloske] did not believe [Neal] was guilty of misconduct." <u>Pope</u>, 406 F.3d at 1009.

To the contrary, all of the evidence in the record shows that Veloske did believe that Neal had engaged in inappropriate harassment behaviors. Veloske wrote up a Disciplinary Action Form noting the allegation and the fact that Neal had been verbally warned. Similarly, when Neal received a salary increase (approximately one month after the allegations) Veloske had some concerns regarding these behaviors. While Veloske's comments on the Authorization for Salary Adjustment form noted positive aspects of Neal's performance, he also documented his concerns regarding Neal's behavior "around the opposite sex." (Neal Decl. Ex. J.) Accordingly, the Court determines that the record does not raise an inference that Veloske's reliance on the allegations of harassing behavior was a pretext for unlawful discrimination.

## 2.    Time-clock Infractions

Neal urges that Veloske's enforcement of Eniva's time-clock policy was also pretext for racial discrimination. Eniva has pointed to three alleged violations of the time-

14

clock policy as contributing considerations in Neal's termination. The Court will consider each of the violations in turn.

In October 2002, Werner, a Caucasian supervisor, reported to Veloske that she saw Neal punch-out for a co-worker who had left work early. Neal argues that Eniva's reliance on this time-clock policy violation is biased because Veloske took the word of Werner over Neal's word that he did not violate the policy. There is, however, nothing in the record to indicate that Veloske should not have taken Werner's report at face value—there are no allegations that she was untrustworthy or racially biased herself. Veloske must be able to rely on his shipping leads in reporting violations of the time-clock policy. Furthermore, there is no evidence that Veloske had any information that would lead him to believe the violation did not occur. Thus, that Veloske credited a supervisor's report of Neal's violation simply raises no inference of racial bias whatsoever. See, e.g., Hitt, 356 F.3d at 924-925.

Regarding the two incidents that occurred in May 2003, Neal argues that Veloske singled him out because of his race. A plaintiff can "demonstrate pretext by showing that he was treated less favorably than similarly-situated employees outside of his protected group." Pope, 406 F.3d at 1009 (citation omitted). "The test for determining whether employees are similarly situated to a plaintiff is a rigorous one." Id. (citation omitted). "For discriminatory discipline claims, employees are similarly situated only when they are involved in or accused of the same offense and are disciplined in different ways." Wheeler

v. Aventis Pharms., 360 F.3d 853, 858 (8th Cir. 2004).  With these standards in mind, the

Court will consider each of Neal's arguments.

First, Neal alleges that the May 8, 2003 time-clock violation demonstrates

Veloske's biased enforcement of Eniva's time-clock policy.  On that occasion, Neal,

Robinson, and Ehalt were outside working on Robinson's motorcycle.  Veloske saw Neal

and Robinson, noted that they had not punched-out, and so marked them "out" on their time-

cards.  Veloske claims that he did not see Ehalt, the only Caucasian outside with Neal and

Robinson.  Neal claims that the fact that Ehalt did not get marked "out" by Veloske, but that

he and Robinson did, shows that Veloske's enforcement of the policy was racially biased.

Viewing the facts in the light most favorable to Neal, the Court cannot conclude that

he has raised an inference of unlawful discrimination.  He does not dispute that he was in

violation of the time-clock policy by not punching-out before taking a break to work on

Robinson's motorcycle.  Even if the Court assumes, as Neal urges, that Veloske actually

saw Ehalt, Neal has not demonstrated that he was similarly situated to Ehalt—that is, there

is nothing to indicate whether or not Ehalt had punched-out, or whether he had violated the

time-card policy in the past.  See, e.g., Pope, 406 F.3d at 1009 (noting that the plaintiff did

not establish pretext in part because the comparison employee "did not have [the plaintiff's]

history of mismanagement . . .").  Thus, Neal has not established that the May 8, 2003

enforcement of the time-clock policy was a pretext for race discrimination.

Second, Neal argues that Veloske's enforcement of the time-clock policy on May

22, 2003 was discriminatory.  Neal points to the fact that Enge, a Caucasian co-worker, was

in violation of the time-clock policy in connection with the same incident, but was not noted as such by Veloske.  Neal also focuses on Veloske's deposition testimony to the effect that his enforcement of the time-clock policy involves his "discretion . . . as a manager."  (Veloske Dep. Tr. at 98.)

Again, Neal has failed to show that Veloske's enforcement of the time-clock policy on May 22, 2003, constituted a pretext for discrimination.  It is clear that Enge and Neal did not engage in the same behavior regarding their time-cards—Neal was reported to have punched-in before he actually started working, whereas Enge punched in five minutes after his lunch period had expired.  The two incidents raise different issues for a supervisor, which is dispositive on the issue of pretext.  Wheeler, 360 F.3d at 858 (noting that employer "was not obligated to treat the two behaviors as substantially similar because they involved objectively different conduct").    Furthermore, as Veloske testified, his decisions regarding enforcement of time-clock policy, are informed by an employee's "prior performances [and] prior problems."  (Veloske Dep. Tr. at 98.)  Here, Neal had prior time-clock violations and workplace behavioral issues.  Accordingly, the Court determines that Neal has failed to present facts which indicate that Veloske's documentation of his time-clock violations constituted pretext for unlawful racial discrimination.

### 3.      Altercation with Duffy

Finally, Neal argues that his interaction with Duffy on May 22, 2003, did not occur as Duffy reported.  According to Neal, he did not raise his voice to Duffy and the "only person who was yelling was Tina Duffy."  (Neal Dep. Tr. at 125.)  He also asserts that the

incident "was a short conversation. . . . Maybe anywhere from 30 seconds to a minute, I

think.  It wasn't very long."  (Id. at 126.)  Neal denies that he threatened or intimidated

Duffy in any way.  He does not, however, deny other aspects of the reported incident, such

as his saying "I'm Big Al" and "I'm not Vitaly or Yelena."  (Id. at 123-24.)

   Neal's arguments miss the point.  That Neal denies that he acted inappropriately, and

asserts that Duffy is the one to blame for the argument, is not evidence that Veloske's

decision to terminate him was a pretext for discrimination.  See, e.g., Dhyne v. Meiners

Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (stating that the plaintiff's "denial

standing alone is not evidence [her boss] fabricated the charge" that led to her termination

(emphasis in original)).  On the contrary, to the extent that Neal's evidence relates to his

relative innocence in the altercation with Duffy, it is irrelevant.  Waggoner v. City of

Garland, Texas, 987 F.2d 1160, 1166 (5th Cir. 1993).  To survive this Motion, he must

produce evidence that Veloske did not believe Duffy's allegations, but relied on the

allegations as a bad faith pretext to discriminate against him on the basis of his race.  Id.

   The evidence in the record indicates that Veloske and Conley believed Duffy's

account of the incident on May 22, 2003.  Veloske also received a written description of

the altercation between Neal and Duffy from Dwyre, an Eniva employee who witnessed the

incident, and that account largely verified Duffy's.  Furthermore, Veloske was aware that

months earlier, Duffy had complained of an incident during which Neal yelled at her in

18

front of others.[13]  (Veloske Decl. ¶ 5.)  Neal attempts to raise a fact issue regarding Duffy's

propensity to have personal conflicts with other Eniva employees.[14]  He has not, however,

submitted any evidence that Duffy was thought of as untrustworthy, or that she ever had

disciplinary issues similar to Neal's.  That Duffy has had issues of her own during her

employment at Eniva does not raise an inference that Neal was subjected to unlawful

discrimination.[15]  See, e.g., Dhyne, 184 F.3d at 989 (noting that the plaintiff did not

establish pretext and that the defendant "would not be the first employer to terminate an

unsatisfactory employee for committing an infraction that might be tolerated in others").

The incident between Neal and Duffy "may well have been 'the straw that broke the camel's

---

[13]As noted earlier, Neal denies that an earlier incident with Duffy occurred, and he
claims that Veloske never raised the issue with him.  However, Neal's argument does not
cast doubt on Veloske's belief that the earlier incident between the two did in fact occur.

[14]Neal's evidence regarding Duffy's issues with her co-workers is incomplete,
bolstering the Court's conclusion that it is not probative of discrimination.  His evidence
largely consists of Robinson's testimony that he has received complaints about Duffy's
behavior toward other Eniva workers.  (Robinson Dep. Tr. at 42-45.)  Robinson reported
those complaints to Veloske, but does not know what Veloske did in response.  (Id.)  This
testimony simply shows that Robinson had no knowledge regarding whether Duffy was
disciplined or warned regarding the complaints; it does not establish that Veloske failed to
act in response to concerns raised about Duffy.  In fact, Veloske testified that he did talk to
Duffy "about how to get along with people in a better way."  (Veloske Dep. Tr. at 119.)
Furthermore, that she may have had issues getting along with others in the workplace does
not excuse any misconduct that Neal engaged in with respect to Duffy.

[15]Neal argues that because Veloske recognized that Neal and Duffy "were both
wrong for bringing up a loud conversation," (Veloske Dep. Tr. at 123), his decision not to
terminate Duffy indicates pretext for discrimination.  Veloske also testified, however, that
Neal "was more wrong by continuing a loud, repeated verbiage afterwards" (id.).  Again, in
showing pretext, "the plaintiff must show that he and those employees outside of his
protected group were similarly situated in all relevant respects."  Pope, 406 F.3d at 1009.

back'"—that does not, however, prove this stated reason for discharge was a pretext for racial discrimination.  Id.

Neal also argues that Veloske's investigation of the Duffy incident was insufficient, as Neal was not given a chance to explain his behavior.  However, it is undisputed that Neal met with Veloske on the morning of May 23, 2003, and that Neal did not provide an explanation of what happened at that time.  (Veloske Decl. ¶ 17.)  Instead, Neal stated "If you're going to terminate me, do it now."  (Id.)  Veloske may have largely made his decision regarding Neal's termination by the time the two met on May 23, 2003 (see, e.g., Neal Decl. Exs. A, C), but Neal's assertion that he was never given a chance to give his side of the story is not supported by the evidence.  Furthermore, while there is a dispute of fact regarding whether or not Robinson was "interviewed" regarding the incident (Robinson Dep. Tr. at 112), Robinson's testimony regarding how the event occurred is consistent in some respects with Duffy's and Dwyre's accounts (id. at 99).[16]

The Court determines that the extent of Eniva's investigation was not obviously deficient, and was based on Veloske's and Conley's business judgment.  As such, the Court will not second guess Eniva's decision to limit the interviews, and act promptly.  See Wheeler, 360 F.3d at 859 (the employer's "limited investigation was based upon a valid business judgment.  We, therefore, are not permitted to review the logic behind the

---

[16]Robinson's account of the incident is similar to Dwyre's in that he does not state that Neal threatened Duffy in any way.  According to Robinson, however, the interaction between Duffy and Neal was much shorter than Duffy or Dwyre stated that it was.  (See Robinson Dep. Tr. at 99.)

decision" (citation omitted)).  The "ultimate burden falls on [Neal] to produce evidence sufficient to create a genuine issue of material fact regarding whether [Eniva's] proffered nondiscriminatory justifications are mere pretext for intentional discrimination," Pope, 406 F.3d at 1007, and he has failed to do so here.  Accordingly, the Court determines that his claim cannot survive summary judgment.

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**: (1) Defendant's Motion for Summary Judgment (Doc. No. 46) is **GRANTED**; (2) Plaintiff's Amended Complaint (Doc. No. 10) is **DISMISSED WITH PREJUDICE**; and (3) Defendant's Motion to Strike the Declaration of Algie Neal dated June 21, 2005 and Plaintiff's Reply to New Information by Eniva Corporation (Doc. No. 70) is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 28, 2005

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge